Robert E. Austin and Marian H. Austin v. Commissioner.
Austin v. Commissioner
Docket No. 57111.
United States Tax Court
T.C. Memo 1958-71; 1958 Tax Ct. Memo LEXIS 157; 17 T.C.M. (CCH) 346; T.C.M. (RIA) 58071; April 24, 1958
*157 Wendell H. Davis, Esq., and Robert E. Austin, Esq., pro se, 500 Poinsettia Avenue, Manhattan Beach, Calif., for petitioners. Gene F. Reardon, Esq., for respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioners' income tax for the years 1950, 1951 and 1952 in the respective amounts of $395.96, $429.46 and $1,676.88. At issue is whether lots which were the subject of certain sales were held by petitioners primarily for sale to customers in the ordinary course of their trade or business. Findings of Fact Some of the facts have been stipulated and are so found. Robert E. Austin (hereinafter sometimes referred to as "Robert" or "petitioner") and Marian H. Austin are husband and wife. They filed joint returns for the years at issue with the then collector of internal revenue at Los Angeles, California. Since 1948 they have resided at 500 Poinsettia Avenue, Manhattan Beach, California. Marian H. Austin is a housewife and had little connection with the transactions set forth below. All lots and sales involved were in the Manhattan Beach area, except one. Robert has practiced law since 1912, and at all times here *158 relevant had his law office in downtown Los Angeles approximately 19 miles from Manhattan Beach. He first became the owner of real property in Manhattan Beach in 1918. This property was transferred to him in payment for legal services. Manhattan Beach was then primarily a resort area, and throughout the period 1918-1929 Robert owned either a cabin or a home there. In 1929 he established his residence in Manhattan Beach, and he has resided there continuously since that year. The population of Manhattan Beach in 1929 was approximately 5,000. Since 1932 Robert has been active in the civic affairs of his community. He has been a member of the School Board. He helped to organize the local water district and has been a member of its Board of Directors. He represents his water district on the Board of Metropolitan Water District of Southern California. The parties have stipulated the following real estate acquisitions by petitioners during the period 1943-1952: [1]
No. of
No. of
Year
Transactions
Lots
1943
2
2
1944
2
5
1945
3
69 1/2
1946
6
64 1/2
1947
6
16
1948
3
9
1949
1
1
1950
1
1
1951
0
1952
0
*159 The lots acquired by petitioners in 1943 were purchased at an auction of tax delinquent properties. Robert and others, prior to the auction, asked the local tax collector to include certain lots among those scheduled for sale, and agreed to make opening bids on these lots. Robert bid on 30 or 40 lots at this auction. Robert purchased one lot for a friend who at the time of the bidding had used up his available funds. Three of the lots acquired in 1944 were received in payment for Robert's legal services. Taxes were never paid by petitioners on this property and the lots were subsequently sold to meet the tax bill. Two other lots acquired in that year were located across the street from where petitioners were then residing, and were purchased to protect the character of the neighborhood. One hundred and two of the lots acquired during 1945 and 1946 were sold to petitioners by the city of Manhattan Beach. The sales arose from the following circumstances: Certain property, located in Manhattan Beach (sometimes hereinafter referred to as the city), was owned by the State of California and was not on the city's tax rolls. In order to list the property on the city's tax rolls it had *160 to be privately owned, and the officials of the city were desirous of bringing about this result. Accordingly, a plan was devised whereby the city could acquire the property and then sell it to private parties. This plan entailed expenditures in amounts greater than the officials of the city were prepared to undertake. To aid in carrying out the plan Robert and three others agreed to pay the city any loss it might suffer as a result of this plan. In accordance with this agreement Robert purchased 102 lots which the city had acquired from the State and which it was unable to dispose of at public auction. Petitioners acquired two lots in 1945 from a Mr. Friedman, one of Robert's clients. Petitioners purchased nine lots from the Pacific Land and Title Company in 1945. These purchases were connected with Robert's membership in the Manhattan Beach Property Owners Association and that association's interest in acquiring a park. Two of the lots acquired by petitioners in 1946 were located across the street from where they then resided, and were purchased to protect the character of the neighborhood. Petitioners acquired 21 lots in 1946 from the Amaranth Land Company. These acquisitions *161 came about in the following manner: A client of Robert's was involved in a joint venture concerning real property. At the death of the client Robert was retained by the deceased's family to represent them in the disposition of the joint venture's property. In the course of winding up the joint venture, and while acting on behalf of the family, Robert entered the highest bid for the property. The family was interested in improving its cash position, and was disappointed in Robert's actions on their behalf. Robert paid the amount bid to the joint venture and the property was sold to him. Petitioners purchased one lot in 1946 and four lots in 1947 which adjoined property already owned by them. The new acquisitions were to provide automobile parking facilities should future improvements on the original lots make such facilities necessary or appropriate. Petitioners acquired two tracts of land, referred to as "lots" by the parties, in 1947 which totaled 125 acres. Part of this acquisition was received by Robert in payment for legal services. Petitioners purchased six lots in 1947 for possible use as a site for a house. They built a house on these lots toward the end of 1948, and since *162 that time it has been their home. Two other lots acquired by petitioners in 1947 were transferred to them by a couple who had earlier been given the property by petitioners with the understanding that they (the couple) pay for it whenever able. The uncertain financial position of the couple in 1947 resulted in the retransfer of the property. Two lots purchased by petitioners in 1947 from a real estate broker were subsequently improved, and supply them with rental income. Two additional lots were acquired in 1947 under the following circumstances: On one occasion in 1947 a client, Mr. Clendennin, came to Robert's office and discussed with him problems concerning certain lots owned by the client's daughter. Clendennin thought that his daughter would eventually lose money on these lots. He returned about one week later, told Robert that he had been advised that he (the client) did not have long to live, and asked Robert to purchase the daughter's property. Robert purchased two lots from the daughter; shortly thereafter the client died. Four lots acquired in 1948 were purchased for residential purposes, and petitioners lived in the house thereon during 1948. They sold this property *163 after moving into the house built on the six lots mentioned above. Petitioners purchased three lots in 1948 from the Pacific Land and Title Company. One lot was purchased in 1949 to make available additional parking and sewage facilities to a building, owned by petitioners, which housed a laundry. Petitioners purchased one lot in 1950 from a neighbor who was unable to pay a debt to Robert. They paid for the lot, in part, by cancelling the indebtedness. Petitioners made the following sales of real property: No. of
No. of
Year
Transactions
Lots
1943
0
1944
0
1945
0
1946
24
38
1947
8
13
1948
22
26
1949
7
15
1950
5
11
1951
8
23
1952
10
14
1953
4
? [2]
1954
1
1955
5
Payment for the sales was sometimes made in installments. Petitioners acquired the lots sold in 1950, 1951 and 1952 in the following years: Year Lot Sold
Year Lot Acquired
1950
1951
1952
1943
1
1944
2
1945
4
1
4
1946
6
20
6
1947
1
1948
2
1949
1
Petitioner made sales of real property in the *164 following total amounts: 1950
$ 7,750.00
1951
15,750.00
1952
21,584.32
Petitioners' gross income for the years 1943 through 1952 was composed of the following items: Number
of Law
Gross
Practice
Amount
Income
Fee
Law Prac-
from
Collec-
tice Fee
Year
Rent
Interest
tions
Collections
1943
$ 1,890.00
$ 195.00
101
$3,849.10
1944
1,140.00
106
6,628.23
1945
122
9,081.18
1946
89
5,345.00
1947
7,596.00
390.00
77
7,649.15
1948
10,762.79
288.40
76
5,977.40
1949
5,838.50
696.38
83
6,079.19
1950
5,456.00
522.51
91
5,232.67
1951
6,820.94
897.72
140
9,360.80
1952
7,125.00
2,144.07
117
6,156.68
Net
Net
Collections
Profit on
From Law
Real Estate
Gross
Year
Practice
Sales
Income
1943
$1,832.93
$ 5,934.10
1944
4,434.48
$ 678.00
8,446.23
1945
5,444.90
210.32
9,291.50
1946
1,756.62
17,655.71
23,000.71
1947
3,502.89
12,357.70
27,992.85
1948
2,166.40
6,737.12
23,765.71
1949
1,476.43
6,029.72
18,643.79
1950
1,162.91
7,782.56
37,637.53
1951
4,851.60
10,476.79
27,556.25
1952
1,279.08
9,308.59
24,734.34
*165 The net profit on real estate sales shown above for the years 1950 through 1952 includes the profit from installment payments received in those years on account of 12 sales made in prior years. Petitioners' income from Robert's law practice and their real estate sales for 1953, 1954 and 1955 follows: Gross
Net
Net
Amount
Amount
Profit on
Law Prac-
Law Prac-
Real Estate
tice Fee
tice Fee
Year
Sales
Collections
Collections
1953
$ 9,256.24
1954
16,675.56
$7,567.00
$2,825.00
1955
19,822.00
9,900.00
4,544.00
The net profit on real estate sales shown above for the years 1953 through 1955 includes installment payments received in those years on account of sales made in prior years. Petitioners did not advertise in connection with their real property, nor did they post any "for sale" signs. They did not list their property with real estate brokers, and neither of them was a licensed real estate broker. They did not maintain an office in their home, and their home telephone number was listed under the name of Marian H. Austin. Sales were initiated by prospective customers contacting petitioners through the mails or over the *166 telephone. Negotiations were conducted in the same manner, and petitioners often did not come into personal contact with purchasers. On some occasions sales were initiated by brokers. On these occasions the brokers were acting for third parties. Whenever necessary Robert would prepare legal documents in connection with a sale in his law office. Prospective customers never came to his law office. Most of the sales involved were closed in escrow offices, not at petitioners' home. Petitioners sometimes borrowed money from banks to help finance real property purchases. There has been a large amount of real estate development in Manhattan Beach since 1945. People interested in purchasing property in Manhattan Beach went through the tax rolls to learn the names of property owners. Owners of property received numerous unsolicited inquiries concerning their property. Petitioners were aware of this situation. The real property owned by petitioners was listed on the tax rolls under the names of Robert E. Austin and Marian H. Austin at their home address. The lots sold by petitioners were held by them primarily for sale to customers in the ordinary course of trade or business. Opinion
*167 RAUM, Judge: Was the real property sold by petitioners during the years in question held by them primarily for sale to customers in the ordinary course of their trade or business? That is the sole question herein. It is essentially one of fact. And, after reexamining the whole record, we have concluded that it should be answered in the affirmative. In this connection the Court of Appeals for the Ninth Circuit in , said, at p. 266: "Most of the cases dealing with the problem of whether property is held primarily for sale to customers in the ordinary course of trade or business involve situations where the taxpayer is engaged in some activity apart from his usual occupation and the question is whether this activity amounts to a business. The test normally applied in these situations is the frequency and continuity of the transactions claimed to result in a trade or business." Applying these principles to the facts of the present case, there appears to be a more or less consistent activity in the sale of lots over a period of years, resulting in a steady flow of income. Taking into account the number of purchases, *168 sales, the frequency and continuity of the transactions over the period involved, as well as other facts of record, we have concluded that the profits in question represented more than the fruits of the liquidation of casual investments but were such as to have had their source in the conduct of a real estate business. Petitioners made a total of 94 sales during the period 1946 through 1955, 23 of which were made in the years 1950 through 1952. Over the longer period not less than 150 lots were sold, and a total of 48 were sold in the three years in issue. We are satisfied that petitioners were not engaged in isolated or casual selling transactions. Petitioners' occupation with real estate matters is better appreciated when it is remembered that during the period 1943 through the years in question they acquired not less than 168 lots in 24 transactions, and that two of these so-called lots totalled 125 acres. Additionally, petitioners' net profits from real estate sales were substantially in excess of the net collections from Robert's law practice in the three years before us and in most of the other years for which we have evidence. See *169 (C.A. 10), and Estate of Luke J. Barrios, 29 T.C., at p. Robert testified that real estate transactions took up little of his time. But, as was pointed out in Estate of Luke J. Barrios, supra, at p., "all the time that was necessary to carry out the transactions was taken by petitioner. The fact that the lots were readily accessible for examination by prospective purchasers and that there was a seller's market enabled petitioner to make each sale with a minimum of time and effort on her part." Moreover, Robert did not include in his calculations the time that he spent in his law office drawing up sales contracts. Petitioners rely on certain facts, significant in other cases, which aid them little in the circumstances of this case. That they did not advertise is of little importance. A seller's market made such activity unnecessary. Estate of Luke J. Barrios, supra; ; ; , affirmed per curiam, (C.A. 6). For the same reason, their failure to improve the property in question is not significant. *170 Petitioners stress their intents and purposes at the time they acquired various properties, but the more significant question is for what purpose was the property held at the time of sale. ; (C.A. 9); Estate of Luke J. Barrios, supra. Moreover, even as to their intents and purposes at the time of acquisition, the record does not convince us of all that petitioners would have us believe. They would have us believe that many, if not most, of their acquisitions were motivated by altruism and civic and moral responsibilities. The evidence was not sufficient in some instances for us to make findings, and, in connection with other acquisitions, Robert's testimony is far from convincing. Petitioners' frequent and continuing acquisitions and sales, their failure to indicate clearly more than a single transaction wherein they did not make a profit and their profits over a period of years persuade us that the testimony attempted to prove too much. On the basis of the whole record we conclude, and have so found, that the real property sold by petitioners was held *171 by them primarily for sale to customers in the ordinary course of their trade or business. Decision will be entered for the respondent. Footnotes
1. Some lots, in addition to the foregoing, were also acquired by petitioners during this period.↩
2. Question marks are used herein to indicate the absence of relevant evidence in the record.↩